IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
July 7, 2003 Session

## JOSEPH SPIVEY v. TERRY PAGE, ET AL.

**Appeal from the Chancery Court for Davidson County**
**No. 99-2690-I      Irvin H. Kilcrease, Jr., Chancellor**

_____

**No. M2002-00674-COA-R3-CV - Filed February 24, 2004**

_____

This appeal involves a question of valuation of the shares of a withdrawing shareholder from a professional corporation. We reverse the trial court's determination that the shares had no value and hold that the valuation should have been made as of the date of withdrawal. We also hold that the withdrawing shareholder may recover the value of his shares from the sole remaining shareholder who removed the corporation's assets after the notice of withdrawal.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Reversed and Remanded**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., and WILLIAM B. CAIN, J.J., joined.

Wade B. Cowan, Nashville, Tennessee, for the appellant, Joseph Spivey.

Thomas T. Pennington; Gregory H. Oakley, Nashville, Tennessee, for the appellees, Terry Page, and Page & Associates, P.C.

**OPINION**

The trial court held that a shareholder who withdrew from a Professional Corporation was not entitled to any compensation for his shares because a balance sheet dated December 31, 1998, almost two months after his withdrawal, indicated that the firm had a negative value. The shareholder argues on appeal that the court's method of valuing the P.C. was flawed, and that he was entitled to one-half of its fair value as of November 3, 1998, the date he terminated his employment. We reverse the trial court because the evidence does not show that the plaintiff's shares had a negative value on the date in question. We also find that the plaintiff is entitled to pierce the corporate veil and hold the sole remaining shareholder personally liable for the judgment.

# I. A PROFESSIONAL CORPORATION

The individual parties in this case are both Certified Public Accountants. Prior to 1996, plaintiff Joseph Spivey was operating his accounting business as a sole proprietorship. Defendant Terry Page had been a one-half owner of the accounting firm of Bateman & Page, P.C. In June of 1996 Mike Bateman decided to leave the firm, and the P.C. purchased his shares for $78,290.

Also in June of 1996, Mr. Page and Mr. Spivey discussed merging their respective firms. They agreed that Mr. Spivey would contribute his client base, or book of business, some furniture and equipment, and additional capital in exchange for the shares that had been surrendered by Mike Bateman, one-half the corporation's stock. They agreed on a method to arrive at the value of the shares being purchased. They began by valuing each other's books of business based on the previous year's billings. It was undisputed that billings to Mr. Page's clients, or his book of business, was an asset of the corporation.

The value of the P.C.'s billings was adjusted downward to reflect its outstanding debt to Mr. Bateman and another debt to the Cheatham County Bank. When the difference between the adjusted value of the two books of business was split in half, the result was $67,000, which Mr. Spivey agreed to pay to equalize each party's contribution to the P.C. Thus, as of June 1996, the P.C. agreed to pay Mr. Bateman $78,290 for one-half of the P.C.'s shares of stock and to sell those shares to Mr. Spivey for his book of business, some equipment, and $67,000.[1] The parties do not dispute that their agreement included a 50/50 split of revenue and expenses after the acquisition price was paid, nor that Mr. Spivey would temporarily draw less in compensation than Mr. Page in order to pay for his shares.

Mr. Spivey paid the corporation $8,000 in cash and moved his practice into a building on Lindsley Avenue owned by Mr. Page and several others. The firm subsequently became known as Page & Associates, P.C. The record indicates that Mr. Spivey did not draw any funds from the P.C. during the last two quarters of 1996, and then drew a lesser amount than Mr. Page during 1997 and the first two quarters of 1998, until he made up the $59,000 that he still owed on his purchase of shares.

On November 3, 1998, Mr. Spivey told Mr. Page that he wanted to withdraw from the P.C. and terminate the business relationship. Mr. Page suggested that they avoid involving attorneys in the process, and Mr. Spivey agreed. They also agreed that each party would retain his own clients, and that Mr. Spivey would take equipment and furniture approximately equal in value to the equipment and furniture he had contributed originally.

---

[1] The only minutes of the corporation in the record document a "Special Meeting of the Stockholders" of Bateman & Page, P.C., conducted on June 3, 1996. The parties listed as present at the meeting were Terry Page, who is described as President and owner of 100% of its shares, and Donna Mooney, Secretary/Treasurer. The purpose of the meeting was to consider two motions. The first motion was to ratify the P.C.'s agreement to repurchase Mr. Bateman's shares. The second was to authorize Mr. Page to negotiate on the corporation's behalf to sell Mr. Bateman's shares to Mr. Spivey. The minutes recite that both motions were passed unanimously.

On November 19, 1998, Mr. Page submitted to Mr. Spivey a document titled "Agreement for Sale of Interest in T. Page & Associates, P.C." *See* Tenn. Code Ann. § 48-101-614(a). The proposed agreement stated that it was "between Joseph C. Spivey (hereinafter called seller) and T. Page & Associates, P.C. (hereinafter called buyer)." It recited the division of the assets previously agreed to by the parties, as well as a cash payment of $10,000 to Mr. Spivey upon acceptance of the agreement, and execution of a non-interest bearing note for $20,626 to be paid to Mr. Spivey at the rate of $1,000 per month. The final sentence of the agreement reads, "[t]his offer from buyer becomes null and void if not accepted by 11:59 p.m. C.S.T. on November 19, 1998." Mr. Spivey declined to accept the offer because he thought it did not reflect a reasonable valuation of his shares. He calculated their value at $88,655, using the same method the parties had used to set the purchase price of the shares when he bought them.

Mr. Page continued to operate the business and to pay his staff through the month of November. On November 30, he executed a $34,000 demand note, as part of a transaction whereby he personally loaned the money to the P.C. for the purpose of paying an I.R.S. assessment. All the equipment owned by the P.C. was declared to be collateral for repayment of the note. Mr. Page signed the note twice, first as President of Terry Page and Associates, P.C., and then as the secured party.

Two days later, Mr. Page sent a letter of default to the P.C., announcing his intention to take immediate possession of the collateral. He paid the I.R.S. assessment on December 16. Sometime in the same month, he formed a Limited Liability Corporation which he called Terry Page & Associates, L.L.C. He transferred his book of business to the L.L.C. and continued to operate as before, with the same staff, the same phone number, the same location, and the same equipment and furniture.

## II. Court Proceedings

On September 21, 1999, Joseph Spivey filed the instant Complaint in the Chancery Court of Davidson County, naming Terry Page individually, and Page & Associates, P.C. as defendants. See Tenn. Code Ann. § 48-101-615(a). He claimed that Terry Page had agreed to purchase or "buy-out" his interest in the accounting firm, and that Page had breached that agreement.

Among other things, the plaintiff asked the court to order an accounting of all the assets of Page & Associates, and for payment of one-half of those assets to him, pursuant to the parties' agreement. He also claimed that Mr. Page was guilty of converting the assets of the firm for his own benefit, and he asked the court to pierce the corporate veil to reach Mr. Page's personal assets. The Answer denied any wrongdoing by the defendants.

The plaintiff then filed an unopposed motion for an accounting. The Chancellor granted the motion and referred the parties to the Clerk and Master for further action. At the first meeting with the Clerk and Master, the attorneys for both parties agreed that under Tenn. Code Ann. § 48-101-613 et seq. an appraisal of the fair value of the withdrawing party's stock was the appropriate procedure

to follow, rather than an accounting. However, the record does not indicate that such a valuation was made at that point, and the case eventually proceeded to trial.

At trial, Mr. Spivey and Mr. Page were the only witnesses to testify. From the trial court's point of view, the key piece of evidence was a balance sheet for Terry Page & Associates, P.C., which was introduced by Mr. Page. The document, dated December 31, 1998, showed assets worth $69,474, and liabilities of $85,282, resulting in a negative net worth for the P.C. The largest liability listed was the $34,000 debt to Mr. Page. The balance sheet did not include the revenues from clients or the corporation's book of business from either Mr. Spivey's clients or Mr. Page's.

Mr. Spivey's attorney argued that the only reason the above-referenced balance sheet showed a negative net worth was that after Mr. Spivey withdrew from the P.C., Mr. Page transferred its most valuable assets to himself and to his new L.L.C. He contended that Mr. Spivey was entitled to be paid $86,655, representing one-half of the difference between the value of his book of business and that of Mr. Page, adjusted for the debts of the corporation. Mr. Spivey testified as to his valuation and explained that the formula he chose was the same formula that had been used to arrive at the amount paid Mr. Bateman when he left the corporation and the amount Mr. Spivey paid to purchase those shares.

Mr. Page's attorney argued that the parties had withdrawn from the P.C. at the same time, each taking his own share of the assets, including his own book of business, and that since the P.C. had a negative net worth, there were no further assets to divide. The court ultimately agreed with Mr. Page and dismissed the complaint in a Memorandum Opinion. The trial court held that "[t]he plaintiff's method of computing the value of his shares in the P.C. is in error." The court found that both parties had withdrawn from the P.C. at the same time (November 3, 1998) and that the firm had a negative net worth at that time, so the fair value of the plaintiff's shares was also negative. The court also found that both parties had "unclean hands," and thus that the plaintiff was not entitled to the equitable remedy of "piercing the corporate veil." This appeal followed.

## III. WITHDRAWAL FROM A PROFESSIONAL CORPORATION

### A. QUESTIONS OF FACT

The trial court's determination of the rights of the parties was ultimately premised on both explicit and implied findings of fact as to the agreement that arose from Mr. Spivey's announcement to Mr. Page that he no longer wished to continue their business relationship. Findings of fact by a trial court are presumed to be correct, and will be confirmed on appeal unless the evidence preponderates otherwise. Rule 13(d) Tenn. R. Civ. P.

There is no dispute that on November 3, 1998, the parties agreed that each would retain his own book of business and that Mr. Spivey could remove furniture and equipment from the P.C. equal in value to the property he had contributed to the firm. However, there was no testimony to indicate that they agreed at that time to dissolve the P.C., or that Mr. Spivey had done anything to waive his

right to have his shares purchased at their fair value under the provisions of Tenn. Code Ann. § 48-101-613(a). In fact, Page & Associate's time-limited offer of November 19 to purchase Mr. Spivey's shares for over $36,000 indicates that Mr. Page recognized a contrary intention.

The trial court found that "[b]oth parties withdrew from the P.C. at the same time." The evidence shows, however, that shortly after Mr. Spivey announced his intention to withdraw, the P.C. offered to buy his shares. When Mr. Spivey did not agree to the price, Mr. Page unilaterally decided to transfer all the remaining property in the P.C. to himself and to change the corporate form under which he did business. It thus appears to us that the evidence preponderates against the trial court's explicit finding that both parties withdrew at the same time, and its implied finding that on November 3 they reached a conclusive settlement as to the division of the P.C.'s property.

## B. VALUATION

The Tennessee Professional Corporation Act, Tenn. Code Ann. § 48-101-601 et seq., regulates the incorporation, powers, governance and dissolution of Professional Corporations in this state. The Act regulates the manner in which shares of a Professional Corporation may be acquired, transferred or canceled.

According to Tenn. Code Ann. § 48-101-613, when a shareholder terminates his employment with a professional corporation, the corporation must acquire his shares at a price the corporation believes represents their fair value. That value is determined as of the date the shareholder terminates his employment.

Under Tenn. Code Ann. § 48-101-613(4)(b), if a price is fixed for shares in a P.C. under its charter or by-laws, or if all the interested parties can agree on a price, then that price controls. If no such price is fixed (as in this case), then the P.C. must deliver a written offer to the shareholder to purchase the shares "at a price the corporation believes represents their fair value." Tenn. Code Ann. § 48-101-614(a). Such an offer was made herein. If the shareholder declines the offer, then the way is open for a judicial determination of value.

Thus, when a professional corporation must acquire the shares of a shareholder who withdraws from employment with the corporation, and the corporation's offer to purchase those shares is rejected, either the shareholder or the corporation is entitled to commence a proceeding "to determine the fair market value of the shareholder's shares." Tenn. Code Ann. § 48-101-615(a). In such proceeding, the "shareholder is entitled to judgment for the fair market value of such shareholder's shares determined by the court as of the date of . . . termination of employment, together with interest from that date at a rate found by the court to be fair and equitable." Tenn. Code Ann. § 48-101-615(d).

The trial court acknowledged that the statute required it to determine the fair value of Mr. Spivey's interest in the P.C. as of the date of his withdrawal from it. The court concluded that Mr. Spivey's shares had a negative value on November 3, 1998, apparently in reliance on its finding that

both shareholders withdrew at the same time and on the December 31, 1998 balance sheet. It appears to us, however, that the evidence preponderates against that conclusion. As of November 3, the corporation had assets that were not considered by the trial court, including the client revenues, or the corporation's book of business (which the parties refer to as their separate books of business), equipment, furniture, and perhaps other assets.

The primary asset of a professional services corporation is the ability of its professionals to meet the needs of its clients and to generate revenue by providing those professional services. Thus, it appears to us that no appraisal of its fair value would be complete without taking into account the continuing ability of its professionals to earn such revenues, whether this asset is labeled as its book of business or identified by some other term. Several cases of this court have acknowledged that principle.

For example, in *Pelot v.Cakmes,* No. E1999-02550-COA-R3-CV, 2000 WL 116046 (Tenn. Ct. App. Jan. 31, 2000) (perm app. denied) the valuation of a dental practice was calculated by combining three methods: Excess Earnings, Market Approach and Cash Flow Method. In *York v. York*, No. 01-A-01-9104-CV-00131, 1992 WL 181710 (Tenn. Ct. App. Jul. 31, 1992) (No Tenn. R. App. P. 11 application filed), we affirmed the trial court's holding that "corporate good will" should factor into the valuation of a doctor's share in a multi-specialty medical group. In *Siegel v. Bible*, No. C.A. 1389, 1991 WL 72728 (Tenn. Ct. App. May 8, 1991)(perm. app. denied) we noted that "[in] 1979 an accepted rule of thumb valuation for an accounting practice was 150% of annual gross fees. *Id*., at *7 n.2.

Mr. Page argues on appeal that including his book of business in valuing the P.C. would be unreasonable and illogical. We cannot agree. The parties determined the price of shares when Mr. Spivey bought in using the same method Mr. Page now objects to. Mr. Spivey bought one half the shares of the corporation, and there is no dispute that the parties agreed that they would each own an equal interest in the P.C. and that Mr. Spivey acquired a 50% interest in the corporation. He was entitled to payment for his one-half interest based on the corporation's value on the date he withdrew. That value must be calculated using the assets held by the corporation at that time as well as its debts. We also believe that the parties' agreement that each would retain his own book of business was a partial agreement as to the manner in which Mr. Spivey would withdraw his equity from the P.C., not a conclusive settlement of Mr. Spivey's rights as a shareholder.

Mr. Spivey asserts that Mr. Page presented no evidence of the corporation's value as of November 3. Mr. Page disputes that assertion and argues that the December 31 balance sheet along with his testimony about transactions between the two dates provide proof of the corporation's negative value. Mr. Page's evidence, however, is based on his position that both shareholders withdrew at the same time. We have rejected that position as unsupported by the preponderance of the evidence. His argument must also rest on his position that the parties agreed on the division of the assets in full settlement of their claims against the corporation, which we have also rejected as unsupported by the evidence.

Mr. Spivey presented evidence of some of the corporation's assets and value as of November 3, 1998. Using bank statements and deposit slips for the immediately preceding twelve months, he calculated that the PC had collected a total of $381,835, $288,867 from Mr. Page's clients and $92,968 from Mr. Spivey's clients. He deducted the corporation's outstanding debts from Mr. Page's book of business, but used what turned out to be an incorrect amount for the I.R.S. assessment.[2]

Mr. Spivey's calculation used the same method for valuing his shares as the parties used to value them when he purchased them. Essentially, he deducted the value of his book of business from that of Mr. Page, reduced for the debts. Mr. Spivey argues that this was the same methodology as was used in the two 1996 transactions. The 1996 formula used current annual billings from the two parties' client bases and deducted the business debts. Mr. Spivey's buy-in price was set to equalize the two shareholders' contributions.

Mr. Spivey does not really argue that the formula he used was designed to arrive at the fair market value of the corporation or his shares in it. Instead, he argues that the methodology he proposed was the same methodology that had been used in two prior transactions and, therefore, should be used again. We agree with Mr. Page, however, that the formula proposed by Mr. Spivey does not necessarily result in the statutorily required valuation.

The trial court rejected Mr. Spivey's method of computing his shares and stated that the statute required that fair market value be determined as of the date of his withdrawal from the P.C. Without further findings or explanation, the court determined that on that date (which the court found was the date both parties withdrew from the corporation), the net asset value of the P.C. was negative.

Because of its conclusion that both parties withdrew simultaneously, the trial court did not value the corporation or its shares as of November 3, 1998. We think the value should be set in the first instance by the trial court which can resolve factual disputes and determine the correct methodology to be applied. Consequently, we remand for a determination of the fair market value of Mr. Spivey's shares as of the date he withdrew, in accordance with the Tennessee Professional Corporation Act.

## IV. PIERCING THE CORPORATE VEIL

Mr. Spivey also requested the court to allow him to recover the amount due him for his shares from Mr. Page, rather than the assetless corporation, by piercing the corporate veil. The original request was based in part upon allegations regarding the corporation's operation prior to Mr. Spivey's withdrawal. At trial Mr. Spivey testified as to various transactions with or conducted by Mr. Page.

---

[2] He estimated an obligation of $7,093, but the assessment turned out to be $34,000.

The trial court rejected this claim. The court noted that piercing the corporate veil is an equitable remedy, and ruled that Mr. Spivey's own participation in the same type of practices he alleged Mr. Page engaged in rendered him ineligible for equitable relief under the doctrine of unclean hands. The trial court found that both parties had at various times charged the cost of personal expenses to the corporation, that some of the expenditures alleged by Mr. Spivey to be improper or unauthorized were actually business expenses, that other expenditures in the corporation's records were simply misunderstood by Mr. Spivey, and that both parties had exchanged accounting services for personal goods and services. The trial court concluded that Mr. Spivey had not carried his burden to justify piercing the corporate veil.

We do not disagree with the trial court that the exceptional remedy of piercing the corporate veil should not apply to any claims arising from the period before November 3, 1998, when both parties participated in the governance of Page & Associates, P.C., and when Mr. Spivey acquiesced in the decisions of the corporation. But after that date, payment of the value of Mr. Spivey's shares became an obligation of the corporation, and Mr. Page became the sole shareholder with the authority to decide how the corporation would deal with that obligation. As Mr. Spivey argues, the sole shareholder's conduct after Mr. Spivey's withdrawal must also be analyzed.

The law of corporations shields the shareholders, directors, and officers of a corporation from liability for the corporation's debts or acts. *See* Tenn. Code Ann. § 48-16-203 (shareholders); Tenn. Code Ann. § 48-18-301(d) (directors); Tenn. Code Ann. § 48-18-403(d) (officers). Although the corporation is thus normally treated as a separate and distinct entity, a trial court may under appropriate circumstances disregard or "pierce" the corporation's separate identity, and make its shareholders, officers, or directors answer for obligations incurred by the corporation.

Our courts have discussed several situations where they may properly ignore the corporate form and apply the equitable principle known as "piercing the corporate veil." For example, such a judicial act has been deemed to be appropriate "upon a showing that [the corporation] is a sham or a dummy or where necessary to accomplish justice." *Schlater v. Haynie*, 833 S.W.2d 919, 925 (Tenn. Ct. App. 1991).

It is likewise sometimes equitable to pierce the corporate veil when the corporate entity is the alter ego of a shareholder or of some other entity, *Oceanics Schools, Inc. v. Barbour,* 112 S.W.3d 135, 139 (Tenn. Ct. App. 2003); *Manufacturers Consolidation Service, Inc. v. Rodell,* 42 S.W.3d 846, 866 (Tenn. Ct. App. 2000); *Stigall v. Wickes Machinery*, 801 S.W.2d 507, 510-11 (Tenn.1990), or when the corporation is liable for a debt but is without funds due to some misconduct on the part of the officers and directors, *Muroll Gesellschaft M.B.H. v. Tennessee Tape, Inc.*, 908 S.W.2d 211, 213 (Tenn. Ct. App. 1995); *Anderson v. Durbin,* 740 S.W.2d 417, 418 (Tenn. Ct. App.1987).

As the chancellor noted, our courts have stated many times that the courts should exercise great caution before piercing the corporate veil, and should not apply the principle precipitately, since there is a presumption of corporate regularity. *Oceanics Schools, Inc.,* 112 S.W.3d at140;

*Schlater*, 833 S.W.2d at 925. The party wishing to pierce the corporate veil has the burden of presenting facts demonstrating that it is entitled to this equitable relief. 833 S.W.2d at 925.

In the present case, Mr. Spivey has demonstrated that he is entitled to recover the value of his shares in Terry Page & Associates, P.C. as of November 3, 1998. But he cannot look to the P.C. for payment, because after that date Mr. Page removed its assets and rendered it unable to pay its obligations.

The proof showed that Mr. Page made a loan to the P.C., taking all its equipment and furniture as collateral. He then foreclosed on the loan within two days, removing the collateral and effectively shielding it from the claims of all other creditors of the P.C. He also created a new entity, Terry Page & Associates, L.L.C., and transferred the corporation's book of business to the L.L.C. Thus, even though the P.C. has continued to exist as a legal entity, it has been rendered insolvent, thereby defeating the legitimate claim of its former shareholder, Mr. Spivey.

These facts match the circumstances described in the cases cited above. Page & Associates, P.C. indisputably functioned as the alter ego of Mr. Page after November 3, 1998, the corporation became unable to pay its debts because of the conduct of its sole shareholder, and it has become necessary to pierce the corporate veil in order to accomplish the justice that Mr. Spivey is entitled to.

Additionally, we note that in *Oceanics Schools, Inc.* this court addressed the question of when it is appropriate to pierce the corporate veil by citing the following factors listed in the case of *Federal Deposit Ins. Corp. v. Allen,* 584 F. Supp. 386 (E. D. Tenn. 1984):

> Factors to be considered in determining whether to disregard the corporate veil include not only whether the entity has been used to work a fraud or injustice in contravention of public policy, but also: (1) whether there was a failure to collect paid in capital; (2) whether the corporation was grossly undercapitalized; (3) the nonissuance of stock certificates; (4) the sole ownership of stock by one individual; (5) the use of the same office or business location; (6) the employment of the same employees or attorneys; (7) the use of the corporation as an instrumentality or business conduit for an individual or another corporation; (8) the diversion of corporate assets by or to a stockholder or other entity to the detriment of creditors, or the manipulation of assets and liabilities in another; (9) the use of the corporation as a subterfuge in illegal transactions; (10) the formation and use of the corporation to transfer to it the existing liability of another person or entity; and (11) the failure to maintain arms length relationships among related entities.

*Oceanics Schools,* 112 S.W.3d at 140.

The court noted that not all these factors need weigh in the plaintiff's favor before the corporate veil can be pierced. *Id.* In light of Mr. Page's conduct of the affairs of the corporation

after November 3, 1998, we believe it is appropriate to pierce the corporate veil and to hold him personally liable for the P.C.'s obligation to Mr. Spivey, if any is found to exist.

## V. Conclusion

We reverse the order of the trial court and remand this case to the Chancery Court of Davidson County for determination of the amount due Mr. Spivey in accordance with Tenn. Code Ann. § 48-101-615, a judgment for that amount against Mr. Page, and any further proceedings that may be necessary. Tax the costs on appeal to the appellee, Terry Page.


_____
PATRICIA J. COTTRELL, JUDGE